*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps Court of Criminal Appeals

Before
TANG, LAWRENCE, and STEPHENS,
Appellate Military Judges

_____

**UNITED STATES**
Appellee

**v.**

**Gilbert SANDOVAL**
Boatswain's Mate First Class (E-6), U.S. Navy
Appellant

**No. 201800355**

Argued: 19 February 2020—Decided: 13 April 2020

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge:
Stephen C. Reyes

Sentence adjudged 16 August 2018 by a general court-martial convened at Fleet Activities Yokosuka, Japan, consisting of officer members. Sentence approved by the convening authority: reduction to E-1, confinement for three years, forfeiture of all pay and allowances for 36 months, and a dishonorable discharge.

For Appellant:
*Lieutenant Commander Kevin R. Larson, JAGC, USN*

For Appellee:
*Major Kerry E. Friedewald, USMC (argued)*
*Lieutenant Kimberly Rios, JAGC, USN (on brief)*
*Lieutenant Kurt Siegal, JAGC, USN (on brief)*

Judge STEPHENS delivered the opinion of the Court, in which Senior Judge TANG and Judge LAWRENCE joined.

_____

**This opinion does not serve as binding precedent, but may be
cited as persuasive authority under NMCCA Rule of Appellate
Procedure 30.2.**

_____

STEPHENS, Judge:

Appellant was found guilty, contrary to his pleas, of attempted sexual assault of a child, attempted sexual abuse of a child (lewd act), attempted sexual abuse of a child (indecent communication), and attempted production of child pornography, in violation of Article 80, Uniform Code of Military Justice [UCMJ]. He was also found guilty, contrary to his pleas, of attempted inducement of a child to sexual activity under 18 U.S.C. § 2422(b), and indecent language, both in violation of Article 134, UCMJ.

Appellant raises four assignments of error [AOE]: (1) the military judge erred when he instructed the members that they could use evidence from other charged misconduct as predisposition evidence to defeat Appellant's entrapment defense; (2) the evidence is legally and factually insufficient to support Appellant's conviction of Specification 1 of Charge II (using the Internet to attempt to induce a minor to engage in sexual activity); (3) this Court should order a new Promulgating Order that accurately reflects the conviction of Specification 1 of Charge II; and (4) the trial counsel [TC] committed unlawful command influence when he shared evidence with the Appellant's wife prior to trial.[1]

The Government concedes the error in the Promulgating Order and we order the necessary changes in our decretal paragraph. We find Appellant waived any error when the military judge instructed the members to use evidence from charged offenses to show Appellant's predisposition to commit other charged offenses. We also find any error, if error, in the military judge's admission of that evidence for the purpose of demonstrating predisposition was harmless beyond a reasonable doubt. However, we find the evidence for Specification 1 of Charge II to be legally insufficient. We set aside the guilty finding to that offense and reassess the sentence.

_____

[1] This AOE was raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). We have considered this AOE and find it to be without merit. *See United States v. Matias*, 25 M.J. 356, 363 (C.M.A. 1987), *cert. denied*, 485 U.S. 968 (1988).

## I. BACKGROUND

### A. Appellant Engaged in Two Different Online "To Catch a Predator" Stings at the Same Time

Appellant was a 32-year-old Sailor stationed in Yokosuka, Japan. He responded to an online post that read "Hi Sailors! Good Job . . . just moved here."[2] The post was accompanied by a smiling emoji with a slightly protruding tongue and a graphic. The graphic depicted a drawing of an older teenage girl from the jaw to the mid-thighs, wearing short shorts and a tank top exposing her midriff. Appellant replied, "Where are you coming from?"[3] He quickly learned the girl who posted this message called herself "Alex" and said she was 14 years old and had just moved to Yokosuka from California. Appellant also learned her mother was in the Navy and her father left them the year before.

Over the course of the next three days, Appellant exchanged messages with "Alex." What he did not know is that Alex was actually a Naval Criminal Investigative Service [NCIS] special agent. He quickly initiated sexual conversation between them. He repeatedly requested lascivious pictures from her and sent her two photographs of his genitalia. Alex sent him pictures of her face, one of the top of her underwear, and one of her legs and feet. These were actually pictures of a different law-enforcement agent—an undercover agent in her "early 20s."[4] Alex repeatedly mentioned she was only 14. The discussion turned to what specific sexual acts Appellant would like to do with her and what she was willing to do. Eventually, they planned on meeting at her on-base apartment while her mother was away from the home. Alex asked Appellant to get her a beverage from the machine in the lobby of her building and come to her apartment. When he arrived, NCIS agents apprehended him.

But Alex was not the only person Appellant was chatting with online. The day after his first communication with Alex, he responded to the following post: "If it has hair? . . . . Its too old!"[5] Those words, along with "Japan Only" were placed in front of

---

[2] Pros. Ex. 1 at 1.

[3] *Id.*

[4] Record at 573.

[5] Pros. Ex. 2.

a cartoon bear known as "Pedo Bear."[6] Appellant replied, "I agree. I like it young and hairless."[7]

It appeared Appellant believed he was communicating with someone younger, because after an initial exchange in which they both revealed they were in Yokosuka, Appellant asked, "You like older men?"[8] The reply was "Yes, but I'm not looking for me. I'm trying to find someone for my 7 yo daughter."[9] The woman said her name was "Jess." He did not know she also was an NCIS special agent.[10]

For the next two days, Appellant and "Jess" discussed the possibility of him having vaginal and oral sex with her daughter while Jess watched. During these exchanges, Appellant told Jess that a seven-year-old was "too young for [him], not developed yet."[11] He also told her, "15 is my preference,"[12] and that he "know[s] a 14 year that wants me to."[13] Jess claimed she first experienced sex at age eight with her step-father and she wanted her daughter to also learn at a young age. Jess told Appellant she previously found one "playmate" for her daughter, and that her daughter "liked it" but that "he left."[14] Jess also told Appellant her husband was away from the home a lot and must never find out what she was planning to do. During their conversations, Appellant brought up the idea he could have sex, or some sort of sexual contact, with Jess. She rebuffed this each time, saying things like, "this isn't about me,"[15] and "no, not looking for that, sorry."[16]

---

[6] According to the "training and experience" of one of the NCIS agents, the "Pedo Bear" was once used as an Internet meme and "kind of turned into . . . a pedophile mascot." Record at 562.

[7] Pros. Ex. 2 at 1.

[8] *Id.*

[9] *Id.*

[10] The two special agents did not initially realize they were both independently chatting with Appellant. The military judge noted this during discussion about instructions. Record at 809.

[11] Pros. Ex. 2 at 2.

[12] *Id.*

[13] *Id*. at 7.

[14] *Id*. at 2.

[15] *Id*. at 12.

[16] *Id*. at 7.

Both Appellant and Jess expressed concerns the other worked for law enforcement and reassured each other they did not. Appellant told her, "the offer is . . . really enticing. I just don't want to get caught doing something immoral even if you are consenting."[17] He asked if it would be "sex only."[18] Jess told him she was okay with him receiving and performing oral sex on her daughter, and that she enjoyed watching this, but would not participate in any sexual activity. Jess also confirmed her daughter had been penetrated with fingers, but had not yet had sexual intercourse. Appellant told Jess he thought he could be "gentle enough" for a seven-year-old girl.[19]

Appellant asked Jess, "Have you talked about these plans with her?"[20] To which Jess responded, "I told her I'm going to find her a new playmate. She was happy about it."[21] But, Jess added, "I just have to find the right person."[22] When Appellant asked, "How soon are you trying to do this,"[23] Jess responded, "Are you serious about this???"[24] He answered, "I'm liking the idea of it. Not very often if ever a mom would give her blessing . . . to f[***] her 7 year old daughter."[25] Jess then asked, "So does that mean you want to??? When do you want to do it?"[26] Appellant replied, "I don't know yet, maybe first week of April."[27] From there, they talked about her husband being gone until "mid May"[28] and that she lived on base in one of the apartment towers. Later in the conversation, Jess asked, "So do you have time off in early April?"[29] and Appellant replied, "I have availability. Not time off."[30]

---

[17] *Id*. at 3.

[18] *Id*. at 4.

[19] *Id*. at 7.

[20] *Id*. at 5.

[21] *Id*.

[22] *Id*.

[23] *Id*. at 6.

[24] *Id*.

[25] *Id*.

[26] *Id*.

[27] *Id*.

[28] *Id*.

[29] *Id*. at 11.

[30] *Id*.

After Appellant asked what Jess liked sexually, she asked why Appellant was "into y[ou]ng"[31] and he responded that he liked "[t]heir innocence and excitement."[32] He told her he had "never gone that young" and that he likes "development."[33] When Jess asked him, "Ok, so are you sure you want to do this? She's not developed at all, lol,"[34] Appellant replied, "I want to it's just pretty far out of my comfort zone. But I do like the idea of feeling 7 year old tight p[***]y."[35] This was essentially the end of their conversation. Appellant never gave a definitive answer to Jess and they never made any concrete plans to meet. The NCIS agents apprehended Appellant at Alex's apartment the day after his last chats with Jess.

As a result of these two undercover investigations, Appellant was charged with offenses relating to both his interactions with Alex and his discussions with Jess about having sex with her daughter. The Specifications under Charge I related to Alex and included attempted sexual assault of a child, attempted lewd acts, attempted communication of indecent language to a child, and attempted production of child pornography. The Specifications under Charge II related to Jess and included attempted inducement and enticement of a child and the completed offense of communicating indecent language to Jess.

**B. The Entrapment Defense Before and During Trial**

Prior to trial, the parties litigated many issues. Among them was discussion of the Government's evidentiary options if Defense raised the entrapment defense. Trial defense counsel [TDC], worried about certain prejudicial statements from Appellant, told the military judge he was concerned that if he challenged the techniques of Government agents during cross-examination, that he might "effectively raise . . . entrapment" allowing the Government to "swing . . . the door . . . open."[36] Later, in that same Article 39(a), UCMJ, session, the TC stated that if Appellant raised "issues of inducement" during trial, then that "squarely opens the door" to other evidence.[37]

---

[31] *Id*. at 12.

[32] *Id*.

[33] *Id*.

[34] *Id*. at 12-13.

[35] *Id*. at 13.

[36] Record at 133.

[37] *Id*. at 137.

After the Government rested its case, Appellant made a motion to dismiss Specification 1 of Charge II pursuant to Rule for Courts-Martial [R.C.M.] 917. After discussing this motion and some of the overt acts required for the Article 80, UCMJ, attempt specifications, the military judge raised the issue of entrapment. When he asked if it was "reasonably raised," Appellant's TDC responded, "Yes, sir."[38] After TDC expounded on this issue, the TC argued against it, and the TDC responded. The military judge said he would take their arguments into consideration and asked, "If the entrapment instruction is given, Government, will you be using the indecent-language specification as evidence of predisposition?" The TC responded, "Certainly, Your Honor."[39] Appellant's TDC never objected to this.[40]

The military judge then gave Appellant's TDC a preview, stating he planned on "having an instruction in there that indicates that the Government has to prove beyond a reasonable doubt the specification related to indecent language first before the members can use that as evidence to show that the Accused was predisposed. Do you understand?" He responded, "Yes, Your Honor."[41]

Just prior to closing arguments on findings, the military judge held two conferences with both parties under R.C.M. 802. Part of the military judge's summary included:

> Initially, I told counsel that I will be giving the entrapment instruction; however, I modified the entrapment instruction in case the Government argues to use the evidence of one specification and charges as evidence of predisposition for the other charge and specifications. I wanted to make sure that if the members are going to pull from one charge as evidence of predisposition for the other charge, that they first find beyond a reasonable doubt that the charge existed—or is—is shown, excuse me, and so we modified the entrapment portion of the instructions to indicate that. Counsel had an opportunity to take a look at it, and they have no objections.[42]

---

[38] *Id.* at 641.

[39] *Id.* at 650.

[40] A fair reading is that the Government merely stated it was seeking to use Specification 2 of Charge II to show predisposition for committing Specification 1 of Charge II, but the TDC did not seek clarification.

[41] Record at 650.

[42] *Id.* at 662.

When both parties were invited to add to the military judge's recitation of the R.C.M. 802 conferences, Appellant's TDC responded, "Nothing further, sir."[43]

**C. The Military Judge's Instructions on Entrapment**

The military judge's instructions stated that the evidence raised the issue of entrapment. However, the military judge instructed the members that they

> may not use the evidence presented on Specifications 1 and 2 of Charge II [Jess] on the issues of whether the Accused was predisposed to commit the offense listed in Specifications 1, 2, 3 or 4 of Charge I [Alex] unless you first conclude that the Government has proven the Accused's guilt beyond a reasonable doubt of Specifications 1 and 2 of Charge II [Jess] . . . .

> You may not use the evidence in Specifications 1, 2, 3 or 4 of Charge I [Alex] on the issue [of] whether the Accused was predisposed to commit the offenses listed in Specification 1 of Charge II [Jess] unless you first conclude the Government has proven the Accused's guilt beyond a reasonable doubt of Specifications 1, 2, 3 or 4 of Charge I [Alex].[44]

The military judge effectively instructed the members that only if they first found Appellant guilty of either the Alex offenses or the Jess offenses, could they then apply the evidence related to those offenses to the other set of specifications.

## II. DISCUSSION

**A. Appellant Waived any Error Concerning the Military's Judge's Instruction on Entrapment; and any Error by the Military Judge to Allow the Use of Charged Offenses to Show Predisposition in the Context of an Entrapment Defense was Harmless Beyond a Reasonable Doubt**

Appellant argues *United States v. Hills*[45] prohibits the Government's use of charged misconduct under Military Rule of Evidence [Mil. R. Evid.] 413 to show Appellant's predisposition to commit other charged offenses. *Hills* had two components: the military judge's admission of the Mil. R. Evid. 413 propensity evidence is reviewed for an abuse of discretion; and the military judge's instructions to the

---

[43] *Id.* at 664.

[44] Record at 685.

[45] 75 M.J. 350 (C.A.A.F. 2016).

members on how to use the propensity evidence is reviewed de novo. So, too, do we have two possible errors here. Of one—the instructions—we are confident Appellant waived any error. The record is less clear on whether Appellant waived, rather than merely forfeited, any alleged error concerning the military judge's admission of the evidence to show predisposition in the context of the entrapment defense. We first turn to the military judge's instructions.

*1. Appellant waived any instructional error*

a. Standard of review for military judge's instructions

"Whether an appellant has waived an issue is a legal question that this Court reviews de novo."[46] In *United States v. Davis*,[47] our superior court recently clarified the difference between an error that is reviewable and one that is not. A forfeiture is "the failure to make the timely assertion of a right."[48] This Court reviews such alleged errors for "plain error"—that is, errors that Appellant must show were "clear or obvious" and resulted in "material prejudice to a substantial right of the accused."[49] However, when an appellant intentionally relinquishes or abandons a known right—this constitutes a waiver.[50] Our superior court has held that it "cannot review waived issues at all because a valid waiver leaves no error for us to correct on appeal."[51]

We are aware, pursuant to *United States v. Chin*,[52] that we may review waived issues if such review is necessary to exercise our Article 66, UCMJ, mandate to "affirm only such findings of guilty and the sentence or such part or amount of the sentence" as we find are "correct in law and fact" and which *should* be approved.[53] We note that, unlike the constitutionally infirm instructions in *Hills*, the military judge here did *not* "violate[ ] Appellant's presumption of innocence and right to have

[46] *United States v. Davis*, ___ M.J. ___, No. 19-0104, 2020 CAAF LEXIS 76 at *6 (C.A.A.F. Feb. 12, 2020) (citing *United States v. Haynes*, 79 M.J. 17, 19 (C.A.A.F. 2019)).

[47] *Id*.

[48] *United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009).

[49] *United States v. Vorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (citations and internal quotation marks omitted).

[50] *Gladue*, 67 M.J. at 313.

[51] *Davis*, 2020 CAAF LEXIS 76 at *6 (citing *United States v. Campos*, 67 M.J. 330, 332 (C.A.A.F. 2009)).

[52] 75 M.J. 220 (C.A.A.F. 2016).

[53] Art. 66(d)(1), UCMJ.

all findings made clearly beyond a reasonable doubt . . . ."[54] In *Hills*, the instructions "provided the members with directly contradictory statements about the bearing that one charged offense could have on another, one of which required the members to discard the accused's presumption of innocence, and with two different burdens of proof—preponderance of the evidence and beyond a reasonable doubt."[55] Here, in contrast, the military judge made clear that the members had to find all facts, to include whether Appellant was predisposed to commit the offenses which the Defense asserted the Government entrapped him into committing, beyond a reasonable doubt. We decline to review this waived issue.

### b. Waiver and the application of *United States v. Davis*

In light of *United States v. Davis*,[56] we are confident Appellant waived any error regarding the propriety of the instructions given. In *Davis*, our superior court held that when a counsel did not affirmatively object when the military judge asked about the instructions he intended to give, the counsel waived any instructional error.

Here, Appellant's TDC was not silent on the issue of the military judge's instructions concerning entrapment and predisposition. As in *Davis*, Appellant's TDC "affirmatively declined to object to the military judge's instructions and offered no additional instructions."[57] The record shows his participation in the instructions process, or at least his imprimatur on the instructions the military judge ultimately gave to the members. This was a clear waiver.

Having determined Appellant waived instructional error, we will not review this issue. However, because he merely forfeited his objection to the admissibility of the evidence, we now review the question of admissibility for plain error.

---

[54] *Hills*, 75 M.J. at 356.

[55] *Id.* at 357.

[56] 2020 CAAF LEXIS 76.

[57] *Id.* at 7.

*2. Appellant forfeited any claim of error regarding the use of evidence of charged offenses as predisposition evidence on other offenses—and any error was harmless beyond a reasonable doubt*

### a. Standard of review for military judge's decision to admit evidence

We review a military judge's decision to admit evidence for an abuse of discretion.[58] A military judge abuses his discretion when his findings of fact are clearly erroneous or if his decision is influenced by an erroneous view of the law.[59] Here, we review the military judge's "underlying evidentiary ruling,"[60] permitting the members to consider the evidence of other charged misconduct as predisposition evidence in response to Appellant's entrapment defense, for an abuse of discretion.

### b. Forfeiture

As stated above, a forfeiture is the "passive abandonment of a right by neglecting to preserve an objection, whereas waiver is the affirmative, 'intentional relinquishment or abandonment of a known right.'"[61] This Court will only review such alleged errors for "plain error"—that is, errors that Appellant must show were "clear or obvious" and resulted in "material prejudice to a substantial right of the accused."[62]

Appellant clearly anticipated the possibility he would employ the entrapment defense, and just as clearly was on notice the Government would respond by offering evidence of predisposition. Even more specifically, Appellant was on notice the Government intended to use other charged offenses for predisposition. When the parties were discussing the entrapment defense, the military judge asked whether the Government would be using the "indecent-language specification" (Specification 2 of Charge II) "as evidence of predisposition."[63] When the TC answered in the affirmative, Appellant's TDC failed to object. This indicates to us that the issue of whether the military judge would be using other charged misconduct to show predisposition was in front of Appellant at trial. His TDC remained silent. This was a forfeiture.

---

[58] *United States v. Eslinger*, 70 M.J. 193, 197 (C.A.A.F. 2011).

[59] *United States v. Lubich*, 72 M.J. 170, 173 (C.A.A.F. 2013).

[60] *United States v. Jeter*, 78 M.J. 754, 771 (N-M. Ct. Crim. App. 2019) (review granted, 79 M.J. 264 (2019)).

[61] *United States v. Davis*, 76 M.J. 224, 227 n.1 (quoting *Gladue*, 67 M.J. at 313).

[62] *Vorhees*, 79 M.J. at 9 (citation and internal quotation marks omitted).

[63] Record at 650.

We do not necessarily extrapolate Appellant's formal waiver on the instructions to also mean that he waived objection to the military judge's decision to use uncharged misconduct to show predisposition. In *Hills*, our superior court treated the instruction and admissibility issues as separate. We do the same here. The totality of the record indicates Appellant acquiesced to the Government's intended treatment of evidence of some charged misconduct as predisposition evidence to defeat an entrapment defense on other charges. But because Appellant's counsel never formally agreed to admissibility, we hold he merely forfeited rather than waived that issue. However, our superior court makes clear in its recent decision in *Davis* that this forfeiture could have easily been converted into a waiver by a simple question from the military judge, "Defense, any objection?" followed by a "No objection, Your Honor." Trial defense counsel in the field would do well to remember this, especially in areas where the Joint Trial Guide[64] calls for the military judge to inquire as such.

Appellant urges us to extend the logic of *Hills* to this case. In short, the question is whether "predisposition" under R.C.M. 916(g) is similar enough to "propensity" under Mil. R. Evid. 413. On the one hand, the concepts of propensity and predisposition appear virtually synonymous. And if using evidence of other charged offenses to show propensity violates an accused's presumption of innocence, then it would appear to follow that using evidence of other charged offenses to show predisposition is also error.

On the other hand, it could just as easily be argued that predisposition evidence (in the context of rebutting the defense of entrapment) has important legal distinctions from propensity evidence (as substantive evidence of guilt). Use of propensity evidence in sexual assault cases under Mil. R. Evid. 413 is "intended to address recidivism and [permit] bolstering the credibility of a victim because '[k]nowledge that the defendant has committed rapes on other occasions is frequently critical in assessing the relative plausibility of [the victim's] claims.'"[65] But the Government's use of predisposition evidence, in this case or any other similar case, flows from R.C.M. 916(g), and the burden that rule imposes on the Government. Once a military judge finds the evidence has raised such a defense, in order to obtain a conviction, the Government must prove beyond a reasonable doubt that either the criminal suggestion did not originate with the Government or that the accused was predisposed to commit the offense.[66]

---

[64] Joint Trial Guide (1 Jan 2019).

[65] *Hills*, 75 M.J. at 355 (second and third alteration in original) (citations omitted).

[66] *See United States v. Whittle*, 34 M.J. 206, 208 (C.A.A.F. 1992).

For the Government to use predisposition evidence—whether from evidence of other charged offenses or uncharged acts—an accused must first speak up and assert this defense to then force the Government to prove it did not entrap him. And it is well-settled that "if evidence has been presented which is relevant to more than one offense, [members] may consider that evidence with respect to each offense to which it is relevant."[67]

With all that being said, these issues were not litigated below, as this error was not raised. On this record, we can resolve the issue much more simply by testing for prejudice, so we need not decide today whether *Hills* should be extended to cover predisposition in the same way as it covers propensity.

### c. Harmlessness beyond a reasonable doubt

Finding a forfeiture by Appellant, we review for plain error. "Whether an error, constitutional or otherwise, constitutes 'plain error' is a question of law that we review de novo."[68] All errors, whether preserved or forfeited, are reviewed under Article 59, UCMJ. A finding or sentence may "not be held incorrect unless the error materially prejudices the substantial rights of the accused."[69]

Nonconstitutional errors from an evidentiary ruling are reviewed "by weighing: '(1) the strength of the Government's case, (2) the strength of the [D]efense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question.'"[70] But constitutional errors are "subject to a 'harmless error' review under *Chapman v. California*," where the Government "bears the burden of establishing that any constitutional error is harmless beyond a reasonable doubt."[71] "Whether an error is harmless beyond a reasonable doubt is a question of law that we review de novo."[72]

If the military judge abused his discretion and committed plain error, we would have to determine whether this error was a constitutional or nonconstitutional error.

---

[67] *United States v. Vela*, 71 M.J. 283, 286 (C.A.A.F. 2012) (citing *United States v. Haye*, 29 M.J., 213, 215 (C.M.A. 1989); *United States v. Hogan*, 20 M.J. 71, 72 (C.M.A. 1985)).

[68] *United States v. Tovarchavez*, 78 M.J. 458, 463 (C.A.A.F. 2019) (citing *United States v. Bowen*, 76 M.J. 83, 87 (C.A.A.F. 2017)).

[69] Art. 59, UCMJ.

[70] *Bowen*, 76 M.J. at 89 (quoting *United States v. Kerr*, 51 M.J. 401, 405 (C.A.A.F. 1999)).

[71] *United States v. Simmons*, 59 M.J. 485, 489 (C.A.A.F. 2004) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)).

[72] *Id*. (citing *United States v. Hall*, 58 M.J. 90, 94 (C.A.A.F. 2003)).

In *Hills*, our superior court seized on the damage resulting from the military judge's decision to admit evidence of other charged offenses for propensity, and the instructions that followed, as doing violence to the constitutional presumption of innocence. We follow *Hills* in determining that any assumed error here would be a constitutional one, and apply the "harmless beyond a reasonable doubt" test.

As is common in these types of "to catch a predator" cases, Appellant asserted the entrapment defense. For the Government to entrap someone, it must first engage in some kind of inducement,[73] which must take the form of "conduct that creates a substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense."[74] The Government may respond by offering evidence of an accused's predisposition, which is demonstrated when "a person accepts a criminal offer without being offered extraordinary inducements."[75]

The entrapment defense is sometimes called "a dangerous defense, which defense lawyers are cautious in using."[76] This is because when Defense raises entrapment, the Government is allowed under R.C.M. 916 to offer "evidence of *uncharged* misconduct by the accused of a similar nature to that charged."[77]

As stated above, Appellant now argues that one of the questions before us is whether, following *Hills*, the Government is similarly prohibited from using evidence of other *charged* misconduct to show an accused's predisposition in defeating an entrapment defense. We need not answer this question now.[78] Even if the mili-

---

[73] *United States v. Howell*, 36 M.J. 354, 359-60 (C.A.A.F. 1993).

[74] *United States v. Hall*, 56 M.J. 432, 436 (C.A.A.F. 2002) (citations and internal quotation marks omitted).

[75] *United States v. Bell*, 38 M.J. 358, 360 (C.M.A. 1993) (quoting *United States v. Evans*, 924 F.2d 714, 718 (7th Cir. 1991)).

[76] *United States v. Clark*, 28 M.J. 401, 406 (C.M.A. 1989).

[77] Rule for Courts-Martial 916(g), Discussion (emphasis added). The Discussion points to M.R.E. 404(b), and its use of uncharged misconduct. One reading of this is that when the Government proves its case in response to the entrapment defense, it is prohibited from using anything other than using *uncharged* acts similar to how "other acts" are used under Mil. R. Evid. 404(b). But another reading is that the use of the word "uncharged" merely directs the reader to Mil. R. Evid. 404(b) because evidence of other *charged* offenses to show predisposition has already been admitted under the other Military Rules of Evidence and may be used for whatever purpose for which it is relevant. We need not decide this here, but note the Discussion section "does not have the force of law" behind it. *Manual for Courts-Martial, United States*, (2016 ed.), App. 21, Introduction, at A21-2.

[78] Though never raised at trial, it is at least an open question whether the predisposition to have sexual contact with an early adolescent, pubescent 14-year-old is the same as the

tary judge abused his discretion by admitting the evidence for this purpose there was no material prejudice to Appellant's constitutional rights. This is because if the evidence of the offenses relating to Jess was used to show predisposition to commit the offenses involving Alex, it was wholly unnecessary and did not contribute to the convictions on this charge and its specifications. And if the evidence of the offenses relating to Alex was used to show predisposition for Specification 1 of Charge II (attempted inducement of Jess' child) it was also without material prejudice to Appellant, because we find, *infra*, that conviction fails as a matter of legal sufficiency.

We are confident the evidence admitted for the Alex specifications already included enough evidence to show beyond a reasonable doubt that Appellant was predisposed to commit those same acts. It is perfectly acceptable to use evidence already admitted for the elements of a crime to show predisposition to commit that same crime.[79]

In reviewing the evidence concerning Appellant's predisposition to commit the offenses involving Alex, we see no evidence the Government offered any extraordinary inducements. It was Appellant who first made contact with Alex, not the other way around. After Alex told Appellant she was only 14 years old, the conversation turned to her father and that she had "daddy issues"[80] because he left her and her mother. Appellant responded, "Nothing wrong with that. I have daughter issues,"[81] and he explained that his 13-year-old daughter frustrated him, but that he still spoiled her. When Alex said she wanted to be spoiled, Appellant said, "I already spoil one, I can spank you if you need that."[82] This is a clear, unprompted sexual reference by Appellant. When Alex appeared to ignore that provocative comment, Appellant asked, "If you get a chance I'd love to see what daddy's little princess looks like."[83] He also told her the conversation was risky and he was "not supposed to talk

---

predisposition to have sexual contact with a pre-pubescent 7-year-old. The Diagnostic and Statistical Manual of Mental Disorders (DSM-5) considers the former to be *hebephilia*, and the latter to be *pedophilia*.

[79] *See, e.g., United States v. Whittle*, 34 M.J. 206 (C.M.A. 1992) (finding predisposition evidence presented on sole charge of wrongful distribution sufficient to defeat entrapment defense).

[80] Pros. Ex. 1 at 3.

[81] *Id.*

[82] *Id.*

[83] *Id.*

to younger girls."[84] Appellant soon received a picture from Alex—which was in fact a picture of another member of law enforcement in her "early 20s."[85] In response, Appellant told her she was attractive and that he wanted to "kiss" and "taste" her and added, "If I find a way, more."[86]

The remainder of their conversation included Appellant's request for lascivious pictures of her ("Doesn't have to be nude, can be bra and panties"; "topless face pic"),[87] discussing sexual practices and her experience level, and their plans to meet up for sexual contact. Appellant also sent her a picture of his erect penis. Appellant drove the conversation into the sexual realm, and there is no evidence of any confusing or elaborate scheme by the Government to induce him into his conduct.

We are able to conclude that any error, if it was error, was harmless beyond a reasonable doubt. Appellant was not induced into his conduct with Alex and any evidence of predisposition the members may have used from the Jess specifications was totally superfluous to the proof beyond a reasonable doubt that already existed based on direct evidence of the Alex specifications.

## B. The Evidence of Appellant Attempting to Induce a Minor into Sexual Activity is Legally Insufficient.

### 1. Standard of review

The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt."[88] We review legal sufficiency de novo.[89]

### 2. The elements of Charge II, Specification 1

In Specification 1 of Charge II, the Government charged Appellant with violating Article 134, UCMJ, under Clause 2 (conduct of a nature to bring discredit upon the armed forces) when he committed acts in violation of 18 U.S.C. § 2422(b). This meant the Government would have to prove all of the underlying elements of violat-

---

[84] *Id.* at 4.

[85] Record at 573; Pros. Ex. 1 at 5.

[86] Pros. Ex. 1 at 7.

[87] *Id.* at 9, 13.

[88] *United States v. Turner*, 25 M.J. 324, 324-25 (C.M.A. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

[89] *Jackson*, 443 U.S. at 319.

ing 18 U.S.C. § 2422(b) in addition to proving these acts were of a nature to bring discredit upon the armed forces. In *United States v. Schell*, our superior court wrote, "To establish an attempt under § 2422(b), we have held that the Government must prove that an accused: (1) had the intent to commit the substantive offense; and (2) took a substantial step toward . . . inducing . . . a minor to engage in illegal sexual activity."[90] In addition, the Government was required to prove—and the military judge was required to instruct—that under the circumstances, Appellant's conduct was of a nature to bring discredit upon the armed forces.

However, the military judge omitted the terminal element in both his written and oral instructions to the members. He did include it in the other specification under Article 134 (Charge II, Specification 2). "Both Article 51(c), UCMJ, and [R.C.M.] 920(e)(1), require a military judge to instruct the members on the elements of each offense charged."[91]

Practitioners often refer to any offense charging an underlying violation of the U.S. Code, or any offense charged under Clause 3 of Article 134, as an "assimilated crime." This is imprecise. Here, the military judge did so,[92] but then corrected himself, telling the TC, "And . . . for the record, I mistakenly called Charge II, Specification 1 the assimilated crime, my mistake, I just used that as a short term; you're using it as a clause 2 crime, so just for the record, when I said assimilated, I understand you're using it as a clause 2 crime under [Article] 134."[93] An offense is "assimilated" only when charging a violation of a state criminal law in an area of exclusive or concurrent federal jurisdiction (absent UCMJ preemption). This is done under the Federal Assimilative Crimes Act[94] and is specifically listed under Clause 3 of Article 134.[95]

But here, it appears the Government chose to avoid the confusion over whether this noncapital offense under the U.S. Code applied in Japan and charged it under Clause 2 of Article 134 instead of Clause 3. The Government charged the required terminal element for Clause 2 in the specification. But despite the military judge correcting himself, he still omitted it from his instructions.

---

[90] 72 M.J. 339, 344 (C.A.A.F. 2013).

[91] *United States v. Payne*, 73 M.J. 19, 20 (C.A.A.F. 2014).

[92] Record at 621, 625, 810.

[93] *Id.* at 810.

[94] Federal Assimilative Crimes Act, 18 U.S.C. § 13.

[95] *See* MCM Part IV, ¶ 60.c.(4)(c)(ii).

We need not dwell on these instructional errors[96] for two reasons: first, under *Davis*, this was likely a waiver; and second, the specification fails for legal insufficiency on other grounds.

### 3. Appellant's actions never amounted to more than mere preparation

The "substantial steps" necessary for the Alex specifications and the inducement of Jess' daughter, are different things; one is the substantial step necessary to attempt to complete the offense of actually having various kinds of sexual contact with a 14-year-old, while the other is merely the substantial step to "induce" a 7-year-old to have sexual contact.[97] Here, we focus on the inducement and look to our superior court's guidance from *United States v. Winckelmann* [*Winckelmann I*].[98]

In *Winckelmann I*, the appellant received letters from second grade children while deployed. He later became "pen-pals" with one of the children and over time, became a friend of the family. Eventually, through an update from the family's Internet service provider, the mother of appellant's pen-pal discovered appellant's online user-name was in a chat room called "boys with small ones." Later, the mother followed appellant into a different chat room and started chatting with him, pretending to be a 15-year-old boy from New York. In their brief chat, she told appellant she was in Brooklyn, that she was bisexual, that she had not yet had sex with a guy, and that she was looking for an older guy for sex. The appellant told the mother he was 27 years old, lived in the East Side of Manhattan, and would have sex with 15-year-old boys "if they want[ed]." At the end of the chat string, appellant asked "u free tonight," but the mother responded, "gotta go talk soon?" and asked if appellant had a phone number. The appellant replied, "e-mail me u want to get together." Other than "ok" and "bye," this was the end of the conversation.

Winkelmann was convicted of violating Article 134, UCMJ, for attempting to persuade and entice a minor in violation of 18 U.S.C. § 2422(b). He appealed, arguing the phrase "u free tonight" did not constitute a "substantial step" and that the conviction was legally insufficient. Our superior court agreed with him and set aside and dismissed the specification.

---

[96] It also appears the military judge did not make clear to the members that the Government was required to prove beyond a reasonable doubt (1) that Appellant had the specific intent to induce and (2) that he took a substantial step toward inducement. This alone is error. *See Schell*, 72 M.J. 339 (reversing guilty plea where military judge failed to explain to accused the "substantial step" requirement for violating § 2422(b)).

[97] *Id.* at 344.

[98] 70 M.J. 403 (C.A.A.F. 2011).

A "substantial step" is more than "mere preparation, but less than the last act necessary before actual commission of the crime."[99] "[A] substantial step must be conduct strongly corroborative of the firmness of the defendant's criminal intent"[100] and "unequivocally demonstrat[e] that the crime will take place unless interrupted by independent circumstances."[101]

Travel is generally considered "a substantial step in § 2422(b) cases,"[102] wherein the substantial step analysis begins to look very similar to the analysis for an attempt under Article 80, UCMJ. But "[t]ravel is not a sine qua non of finding a substantial step in a section 2422(b) case."[103] So the question is what sort of action— or speech—constitutes a substantial step? In one § 2422(b) case, the U.S. Court of Appeals for the Third Circuit affirmed the conviction of an appellant who spoke repeatedly with a police officer posing as a step-father who was offering his young step-son for sex. The court recounted the appellant's actions that amounted to a substantial step: he posted an online advertisement seeking sexual contact with young children, he repeatedly talked on the phone and e-mailed the undercover police officer who responded to the ad, and he arranged a rendezvous. The court declared that "each of these actions could constitute a substantial step toward the violation of § 2422(b)."[104] But earlier in the opinion, the court chose not to "burden readers with the details of"[105] his phone calls and e-mails. However, the court did find it was "abundantly clear from the record that [appellant] was *determined* to meet and have sex with a child."[106] With that in mind, we consider the nature of Appellant's speech with Jess.

Appellant's speech did not have any "concrete conversation"[107] such as a plan to meet. He never discussed "where they would meet, how they would find each other,

---

[99] *Id.* at 407 (quoting *United States v. Chambers*, 642 F.3d 588, 592 (7th Cir. 2011)).

[100] *Id.* (quoting *United States v. Jackson*, 560 F.2d 112, 116 (2d Cir. 1977)).

[101] *Id.* (alteration in original) (quoting *United States v. Goetzke*, 494 F.3d 1231, 1231 (9th Cir. 2007)).

[102] *Id.* (citing *United States v. Gagliardi*, 506 F.3d 140, 150 (2d. Cir 2007); *United States v. Tykarsky*, 446 F.3d 458, 469 (3d. Cir. 2006); *United States v. Munro*, 394 F.3d 865, 870 (10th Cir. 2005)).

[103] *Id.* (alteration in original) (quoting United *States v. Gladish*, 536 F.3d 646, 649 (7th Cir. 2009)).

[104] *United States v. Nestor*, 574 F.3d 159, 161 (3d Cir. 2009).

[105] *Id.*

[106] *Id.* (emphasis added).

[107] *Winckelmann*, 70 M.J. at 408.

what they would do when they met, or make any other specific arrangements to facilitate the rendezvous."[108] Appellant had no ability to find Jess, even if he had wanted to. He did not know where she lived beyond one of the numerous apartment towers on base. He did not propose a date more specific than to say he had some availability in "early April."[109] And importantly, he continued to express reservations about whether he would go through with the meeting because he typically liked older children.

In the absence of concrete conversation, a § 2422(b) charge may be affirmed if Appellant took the substantial step of grooming the child. To be sure, there are some statements to Jess that could be considered as discussing what Appellant and her daughter would do if such a hypothetical meeting actually took place, but in context they fall outside the realm of "grooming" language[110] "within the common understanding of persuade, induce, or entice."[111] He did ask if "it would be sex only" adding that he likes "getting oral" and he would "give sometimes too."[112] He also said he was "liking the idea of it," he "would like to f[***]" but wanted "oral too."[113] When asked if he could be "gentle enough" for a seven-year-old he replied, "I think so" and described how he would gently lower her down and guide her "up and down" on top of him.[114]

As vile as such statements are—and these statements made up the bulk of the indecent language specification (Specification 2 of Charge II) that was merged[115] with this specification during sentencing—they simply do not amount to grooming *the supposed child.* There was no relationship with the daughter, even through the mother. Appellant asked the mother, "Have you talked about *these* plans with

---

[108] *Id.*

[109] Pros. Ex. 2 at 11.

[110] *Winckelmann I*, 70 M.J. at 408 n.6. " 'Grooming' behavior refers to the 'sexualization of the relationship' over time through repeated contact and attempts to gain affection in preparation for sexual activity." (citing *United States v. Brand*, 467 F.3d 179, 202 (2d Cir. 2006) (quoting Sana Loue, *Legal and Epidemiological Aspects of Child Maltreatment*, 19 J. Legal Med. 471, 479 (1998)).

[111] *Gladish*, 536 F.3d at 649 (quoting *United States v. Goetze*, 494 F.3d 1231, 1237 (9th Cir. 2007)).

[112] Pros. Ex. 2 at 4.

[113] *Id.* at 6.

[114] *Id.* at 7.

[115] Record at 810-12.

her?"[116] She responded, "I told her I'm going to find her a new playmate. She was happy about it."[117] It is clear "these plans" refer to the overall plan of the mother finding a new person to have sexual contact with her daughter. The "discussion" she had with her daughter was a *past* discussion as evidenced by the past-tense words "told" and "was." The mother cannot be discussing any *current* plans between Appellant and the mother because no plans had been made. In fact, she punctuates this exchange with, "I just have to find the right person."[118] Appellant has not actually agreed to do anything, hedging any potential affirmation with statements like, "the offer is . . . really enticing" and "I'm liking the idea of it."[119] It is difficult to see how grooming can occur outside the context of a relationship with the supposed child, even through an intermediary. If Appellant's words do not amount to grooming, then without some travel or discussion of "concrete plans," they are just talk—vile talk— but in the context of a substantial step for section 2422(b), just talk nonetheless.

As Judge Posner explains in *United States v. Gladish*, "[t]reating speech (even obscene speech) as the 'substantial step' would abolish any requirement of the substantial step. . . . The requirement of proving a substantial step serves to distinguish people who pose real threats from those who are all hot air."[120] Appellant's words were vile and prurient. They were already illegal under Article 134, UCMJ, as indecent language, and Appellant was convicted and punished for them. But even considering these statements "in the light most favorable to the prosecution,"[121] they never amounted to even mere preparation, much less a substantial step. Therefore, this evidence is legally insufficient to sustain Appellant's conviction of Specification 1 of Charge II.

**C. Sentence Reassessment**

Having set aside and dismissed the conviction for Specification 1 of Charge II, we must now consider whether we can reassess the sentence pursuant to *United States v. Winckelmann* [*Winckelmann II*].[122] In *Wincklemann II*, our superior court again had the aforementioned *Wincklemann I* case before it, this time determining wheth-

---

[116] Pros. Ex. 2 at 5 (emphasis added).

[117] *Id.*

[118] *Id.*

[119] *Id.* at 3; 6.

[120] 536 F.3d at 650.

[121] *Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017 (quoting *United States v. Gutierrez*, 73 M.J. 172, 175 (C.A.A.F. 2014)).

[122] 73 M.J. 11 (C.A.A.F. 2013).

er the lower court abused its discretion when it reassessed the sentence rather than order a rehearing for sentencing. It laid out four now-familiar "illustrative, but not dispositive"[123] factors for courts of criminal appeals to consider. The factors include: (1) whether there are "[d]ramatic changes in the penalty landscape and exposure"; (2) whether an appellant "chose sentencing by members or a military judge alone"; (3) whether the "nature of the remaining offenses capture the gravamen of criminal conduct included within the original offenses and, in related manner, whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses"; and (4) whether the "remaining offenses are of the type that judges of the courts of criminal appeals should have the experience and familiarity with to reliably determine what sentence would have been imposed at trial."[124]

We prioritize the first and third factors in our analysis. In considering the change in the penalty landscape and exposure, we focus on the confinement time, because the dishonorable discharge was mandatory for the conviction for Specification 1 of Charge I (attempted sexual assault of a child—Alex). Overall, Appellant was facing a maximum of 75 years' confinement. For the four specifications of Charge I (relating to Alex), the maximum confinement was 55 years, and the maximum confinement for Charge II was an additional 20 years. Prior to merging for sentencing, the two specifications of Charge II carried maximum confinement terms of 20 years (Specification 1 (2422(b)) and 6 months (Specification 2 (indecent language)), respectively. So, if the 2422(b) conviction is removed from the equation, Appellant's confinement exposure is decreased from 75 years to 55 years, 6 months.

Initially, this may appear to be a significant change in the penalty landscape, but neither the confinement amount alone is dispositive for this factor, nor are these factors as a whole dispositive. We are also mindful that in *Jackson v. Taylor*,[125] the first such case challenging the ability of the courts of criminal appeals to conduct sentence reassessments, the sentencing landscape changed much more significantly than in this case. In *Jackson*, the appellant received a life sentence after he was convicted of premeditated murder and attempted rape. The board of review (as it was called then) set aside the murder conviction, and reassessed the sentence for attempted rape to 20 years' confinement—the maximum remaining confinement—

---

[123] *Id.* at 15.

[124] *Id.* at 15-16.

[125] 353 U.S. 569 (1957).

and was upheld for doing so.[126] The difference between life imprisonment and 20 years' confinement is much more significant than the difference here.

Rather than focus on numbers, we focus on the lack of change to the sentencing landscape had Appellant been acquitted of the § 2422(b) offense (or what it looked like at trial compared to what a rehearing on sentencing would look like). Prosecution Exhibit 2, the Appellant's conversations with Jess, would still be admissible. Convictions for both Specifications under Charge II resulted from the same exhibit. The only difference would be that Appellant no longer stands convicted of attempting to induce a child—albeit a fictional one—into sexual conduct. While this difference may appear to be a wide gulf on paper, in reality, members might chalk up the 20-year maximum confinement amount for a § 2422(b) conviction to the appropriate consequences of attempting to induce an *actual* child into sexual conduct. From their sentence of only 36 months for Appellant, it appears they did just that (within the unitary sentencing structure). What the members saw, and any new members at a rehearing for sentencing would still see, is Appellant saying words that, no matter how vile and disturbing, could never lead to action to harm a real child. The members were already aware no actual child was involved, leading us to conclude the difference in any "significant or aggravating circumstances" is de minimus.

We can reassess the sentence "more expeditiously, more intelligently, and more fairly"[127] than new members. We note Appellant was well represented in sentencing; members could have imposed a substantially higher sentence. We cannot reassess a higher sentence for Appellant,[128] and it seems unjust and illogical in this case to simply assume he would have received the same sentence absent the § 2422(b) conviction.[129] Based on the evidence presented at sentencing, we can confidently reassess his sentence to include a dishonorable discharge, reduction to E-1, forfeiture of all pay and allowances, and confinement for 30 months.

---

[126] *Id*. at 573.

[127] *Winckelmann*, 73 M.J. at 16 (quoting *Jackson*, 353 U.S. at 580).

[128] *United States v. Hawes*, 51 M.J. 258, 260 (C.A.A.F. 1999).

[129] *Id*. at 261, (Sullivan, J., dissenting) ("The facts of this case make it highly unlikely that appellant would receive the exact 'same sentence' at a sentence rehearing."); *United States v. Davis*, 48 M.J. 494, 497 (C.A.A.F. 1998) (Sullivan, J., dissenting) ("It simply defies logic to suggest that the members would have imposed the same punishment for an indecent assault . . . as it would have for an assault with intent to commit rape.").

### III. CONCLUSION

After careful consideration of the record, briefs, and excellent oral arguments from both appellate counsel, we conclude the findings for the specifications under Charge I, along with Specification 2 of Charge II are correct in law and fact. We find the evidence in support of Appellant's conviction of Specification 1 of Charge II to be legally insufficient. We **SET ASIDE** that conviction, and that specification is hereby **DISMISSED WITH PREJUDICE.** Following this action, we find no error materially prejudicial to Appellant's substantial rights. Arts. 59, 66, UCMJ. We find the reassessed sentence is correct in law and fact. Accordingly, the findings as modified and sentence as reassessed are **AFFIRMED**

However, we note that the court-martial order does not accurately reflect Appellant's pleas and findings. Although we find no prejudice from this scrivener's error, Appellant is entitled to have court-martial records that correctly reflect the content of his proceeding.[130] For Specification 1 of Charge II, the Government dismissed the "persuade" and "coerce" language from the specification after arraignment. The military judge later dismissed the "entice" language from the specification. Accordingly, we order correction of records in this case to accurately reflect Appellant's pleas.

Senior Judge TANG and Judge LAWRENCE concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court

---

[130] *United States v. Crumpley*, 49 M.J. 538, 539 (N-M. Ct. Crim. App. 1998).